Charles R. Goddard v. Commissioner.
Goddard v. Commissioner
Docket No. 75023.
United States Tax Court
T.C. Memo 1962-83; 1962 Tax Ct. Memo LEXIS 225; 21 T.C.M. (CCH) 419; T.C.M. (RIA) 62083; April 13, 1962
Llewellyn A. Luce, Esq., and E. Edward Stephens, Esq., for the petitioner. George J. Rabil, Esq., for the respondent. KERN Memorandum Findings *226 of Fact and Opinion Respondent determined deficiencies in income taxes and additions to tax against the petitioner for the calendar years 1948, 1949, and 1950, as follows: Addition to Tax
Year
Deficiency
Sec. 293(b), I.R.C. 1939
1948
$28,397.03
$14,198.51
1949
9,205.76
4,602.88
1950
379.22
189.61
Most of the deficiencies for 1948 and 1949 here in issue arise as a result of the respondent's determination that certain unidentified deposits made by petitioner to his bank accounts constituted taxable income to petitioner. The petitioner assigns that determination as error, as well as numerous other relatively minor issues, some of which minor issues have been resolved by stipulation. The issues remaining for our decision are: (1) Whether certain lots owned by petitioner and located in Hartford, Connecticut, were income-producing property within the meaning of section 22(n)(4) and section 23(a)(2), [1] so as to permit the deduction of expenditures made in connection with these lots as ordinary and necessary business expenses, and, further, whether a loss resulting from the sale of 5 of these lots in 1950 constituted a loss within the meaning of section *227 117(j)(1). (2) Whether and to what extent petitioner maintained an office devoted to his income-producing activities in a portion of his living quarters which would entitle him to deduct a portion of the expenses thereof as ordinary and necessary business expenses in each of the years in issue. (3) Whether certain interest payments made by petitioner in 1948, 1949, and 1950 were connected with his income-producing activities and therefore deductible under sections 22(n)(4) and 23(b). (4) Whether the degree of control exercised by petitioner over certain accounts in a savings and loan association in the names of his children, of which he was acting as trustee, was such that the income resulting therefrom should be ascribed to petitioner, and, further, whether alleged payments made by petitioner constituted payments of interest on loans from these accounts. (5) Whether certain payments of taxes and interest were deductible under sections 22(n)(4), 23(b), and 23(c), or nondeductible payments made in connection with the acquisition of certain property located on Colesville Road *228 and thus properly added to the basis of the property. (6) Whether the respondent erred in his inclusion in petitioner's income of certain amounts variously reported as interest or miscellaneous income on petitioner's returns, and for which petitioner offered no "breakdown" in addition to the interest or rental income subsequently stipulated by the parties as the correct amount of petitioner's interest or rental income during each of the years 1948, 1949, and 1950. (7) Whether, as heretofore stated, certain unidentified deposits to petitioner's bank accounts in 1948 and 1949 constituted taxable income to petitioner. (8) Whether all or any part of the deficiencies for each of the years involved was due to fraud with intent to evade the payment of taxes. Findings of Fact Some of the facts have been stipulated by the parties. We find those facts to be as stipulated and incorporated herein by this reference the stipulation of facts and the exhibits attached thereto. Petitioner is an individual residing in Washington, D.C. For each of the years involved herein petitioner filed his individual income tax return with the then collector of internal revenue at Hartford, Connecticut. *229 Petitioner's returns were filed for calendar years on a cash receipts and disbursements basis. The petitioner was born on March 25, 1888, in Southwick, Massachusetts. In 1903 he began to work on a fee basis in the Hartford, Connecticut, post office, where he remained until he enrolled as a student in the law school at Yale University in 1908. He earned his own expenses by various means, including door-to-door soliciting of orders for a sales firm. On July 6, 1909, when petitioner was 21, he called upon Lucinda M. Treat (sometimes hereinafter referred to as Lucinda), a widow and resident of Hartford, in an unsuccessful attempt to sell her some stockings. Lucinda developed an amorous interest in petitioner. After her promise to give him the marriage settlement described later they were married on September 1, 1909. At that time petitioner was 21 years old. Lucinda was 70 years old. Her deceased husband, Edwin Treat, who was 20 years older than Lucinda, had been a small farmer and a successful cattle dealer for many years. After he made sales of cattle he made it a practice to give Lucinda large amounts of money as a tribute to her charms. This money Lucinda saved and kept as her own *230 during her marriage to Treat, which lasted for about 50 years until Treat's death in 1906. By that time these savings, kept in cash, had accumulated to a considerable sum (over $100,000). The existence of this large amount of cash was known only to Lucinda and Treat. They had one child, a son, who had married a woman disliked by Lucinda, and had moved away from the family home. The relationship between Lucinda and her son was not close. When Treat died in 1906, this considerable cash sum saved by Lucinda over the 50 years of her married life was not included in Treat's estate and its existence was not disclosed to anyone. This estate consisted of personal property valued at $33,939.74 and real estate valued at $8,250. Lucinda received one-third of the personal property and one out of five parcels of real estate which she transferred to her son on condition that he pay to her $200 a year during her life. The son received the remainder of Treat's estate. Lucinda's father had died in 1858 leaving an estate valued at $3,060.97. She inherited from him 3 1/2 acres of "plough land," together with a remainder interest in certain property distributed as dower to her mother. Prior to her *231 marriage to petitioner and as an inducement to him to marry her, Lucinda offered to give petitioner a "marriage settlement" of over $100,000. At or immediately following the marriage and pursuant to this agreement, Lucinda gave to petitioner a large part of her cash savings, which, at that time, he secreted in Lucinda's house. Petitioner was and always has been ashamed of this transaction. At the same time he was and has been anxious to retain the fruit of his shame. Consequently, he was anxious to keep this transaction and his possession of the large sum of cash received by him from Lucinda a secret. Immediately after her marriage to petitioner in 1909, Lucinda's son and his wife petitioned the Court of Probate for the District of Hartford to appoint a conservator to safeguard Lucinda's property. That court appointed a conservator. Lucinda appealed to the Superior Court of Hartford County, which reversed the order of the Court of Probate, and the action of the Superior Court was affirmed by the Supreme Court of Errors of Connecticut (83 Conn. 516, 77 Atl. 959 (1910)). A paragraph from that court's opinion summarizes the facts found below as follows: The facts found *232 are substantially these: Lucinda M.C.T. Goddard is 70 years old. She has both real and personal property accumulated by herself and her first husband, who died in 1906. She administered his estate properly and with little assistance. A mutual distribution of the estate was made by her and her son, in pursuance of which she received several thousand dollars, and the son took possession of the homestead, to occupy it as a home for his own family, agreeing to pay his mother $200 a year for the privilege. Mrs. Goddard bought a house in Hartford and has since made her home in it, living alone, doing her own housework, buying her own supplies, and caring for herself without help. She has rented a part of the house, collecting rents herself, and with these and the income of $200 received from her son has supported herself comfortably. She has been careful and economical in managing her affairs, has saved and somewhat increased her share of her first husband's estate, and has shown willingness and ability to live within her means. Since November, 1909, she has been permitted to continue to collect the rents herself, and to use the money as she wished, accounting to her conservator, and she *233 has done this satisfactorily and carefully. During this time the income of her property has amounted to $498, of which she has drawn only $128, and has not asked for any more. Mrs. Goddard has shown some of the signs of the usual weakness of old age, and "is now somewhat afflicted by senile dementia, progressive in its nature and possibly erotic, but not yet advanced to such an extent as to impair in any degree her ability to manage her affairs." On July 6, 1909, Mrs. Goddard met her present husband for the first time, when he called at her house to sell stockings. He was then 21 years old and a student in the Yale Law School, was capable, industrious, and prudent in his own affairs, had earned and saved some money for himself, and was working in his vacation. On September 1, 1909, while her son was absent from Hartford, Mrs. Goddard married this young man. When the marriage license was obtained, he declared under oath that Mrs. Goddard was 36 years of age, repeating correctly the statement of her age made to him by her. They have since lived happily together. * * * In the conservator's proceeding an inventory filed with the Court of Probate for the District of Hartford disclosed *234 that Lucinda had $6,797.61 in the State Savings Bank, $3,451.15 in the Mechanics Savings Bank, and $8,290.98 in the Society for Savings. Her total estate, as of December 20, 1909, was valued at $21,639.74, based upon the assets found by the conservator. These did not include the cash given by Lucinda to petitioner at the time of their marriage or any other part of Lucinda's cash savings, the existence of which was not disclosed to the conservator and which was unknown to Lucinda's son. The conservator was removed the following spring. The petitioner continued his law studies at Yale. He commuted to New Haven by train, and his wife Lucinda continued to manage her own affairs. At some time after their marriage Lucinda gave petitioner a further large amount of cash pursuant to her premarital agreement. This was also secreted by petitioner in Lucinda's home. Lucinda died in 1913 at the age of 74. After her various creditors were paid, an inventory filed by the administrator of her estate listed assets valued at $23,412.75, including deposits of $9,919.94 in the Society for Savings, $5,474.61 in the State Savings Bank, and $4,004.73 in the Mechanics Savings Bank, but not including any *235 of the secreted cash given by Lucinda to petitioner. At some time after January 4, 1915, Lucinda's son received two-thirds of this amount, and the petitioner received one-third, or $7,582.14, as well as a diamond ring of unknown value which was in his possession, and, although mentioned, the value of this ring was not included in the inventory valuation in any of the reports filed in connection with the administration of Lucinda's estate. In a supplementary accounting rendered a few months later petitioner received an additional $83.14. Sometime in 1913 or 1914 petitioner purchased some lots located on Otis Street, about 2 miles from the center of Hartford, Connecticut, paying for them $8,000 out of the cash given to him by his wife at the time of their marriage. These lots were 80 feet wide and 70 feet deep and contained a deep loamy topsoil which made them peculiarly adaptable for garden purposes. Petitioner rented them until shortly after World War I to a tenant who ran a greenhouse. When that tenant ceased carrying on the greenhouse business, petitioner rented these properties for small sums for gardens. After 1944 he was unable to rent them although he made every effort to do *236 so. In 1923 petitioner sold one of these lots and in 1926 he sold another. During the taxable year 1950 a real estate man approached petitioner with an offer to buy them and petitioner sold 5 of the 6 remaining lots for $2,493.17. These lots at the time of their sale constituted property used in petitioner's trade or business. Petitioner is and has been for many years an attorney and a member of the bar. He practiced law in Hartford from 1911 to 1917, using his home as an office for about 18 months. He later moved to an office on Main Street, which he shared with another attorney until entering military service in September 1917. After Lucinda's death he moved the cash which had been secreted in her house to a safe located in this office. Petitioner was discharged in August 1919 and thereafter he resumed his practice of law in Hartford. In January 1920 he came to Washington, D.C., to work in the land office of the Department of Interior. He began working for the then Bureau of Internal Revenue in September 1920. In 1921 he rented a safe-deposit box in a Washington bank. His starting salary with the Bureau was $1,240 per annum, which was periodically increased, and after February 8, 1931, he *237 was earning $2,600 yearly. No further increases were granted until January 7, 1945, when his salary was increased to $3,090 per annum. Thereafter petitioner received periodic increases. In 1947 his salary was increased to $3,773 a year. On July 11, 1948, his salary was increased to $4,103.40 a year. On October 29, 1950, his salary was raised to $4,325 a year. On December 20, 1922, petitioner was married a second time, and in May 1923 he and his wife moved into a house they purchased at 1462 Belmont Street, N.W., Washington, D.C., where the petitioner still resides. Shortly thereafter his wife resigned her Government position. Petitioner and his second wife had 2 children - Janetta, who was born in 1925, and James, who was born in 1934. Petitioner's second wife died in 1945. The petitioner was transferred to New York on February 6, 1928, to perform auditing duties in the office of the internal revenue agent in charge at the Custom House. After being on duty in New York for several months, petitioner sought the assistance of a United States Senator in securing his transfer back to Washington. In a letter addressed to the Honorable Charles Curtis petitioner stated that he could not *238 on "a salary of $45.00 per week * * * keep up a room in New York City and properly support my family in Washington, D.C., where my family necessarily remain because we have been unable to sell the home." He further stated that he had "no money to hire help for her," [his wife] and that she "had no income upon which [she] could live." Sometime later petitioner was transferred back to Washington where he continued to work until 1937 as an auditor or revenue agent with the Internal Revenue Bureau, in which capacity he dealt with income tax returns. On March 1, 1935, and October 15, 1936, respectively, petitioner opened savings accounts in his children's names at the Perpetual Building Association in Washington, D.C. (hereinafter referred to as Perpetual), the first account belonging to Janetta (carried in the name of "Janetta Haynes Goddard, By Charles R. Goddard, Trustee"), and the second to James (carried in the name of "James Robert Goddard, By Charles R. Goddard, Trustee"). These accounts were initially of small amounts, but on June 19, 1945, both accounts were substantially increased as a result of deposits of $1,131.65 to Janetta's account and $1,061.31 to James' account. *239 The petitioner was trustee for both accounts. On April 15, 1939, petitioner borrowed $6,000 from his wife, who had just sold a farm which belonged to her, and he agreed to pay her 5 percent interest per annum. He gave her a demand note as evidence of the indebtedness. On December 20, 1941, petitioner borrowed another $1,000 from his wife, who had received that amount as a result of a paid-up endowment life insurance policy. Petitioner again gave his wife a demand note for that amount and agreed to pay her 4 1/2 percent interest on the principal amount borrowed. Both of these notes were subsequently endorsed "Pay to the order of Janetta H. Goddard and James R. Goddard," and after his wife's death in 1945 petitioner paid the interest to his children by depositing to their respective accounts at Perpetual amounts equivalent to the interest due on these notes. Petitioner also withdrew as loans other amounts from his children's accounts during the taxable years on which he paid interest at a rate of 3 percent per annum (the rate of interest paid currently by Perpetual) by making deposits to their accounts. In 1948 these deposits of interest totaled $356.87, in 1949 $411.25, and in 1950 *240 $399.50. Petitioner's wife had made the loans to her husband rather than depositing the money in the bank because the interest rate she received from him was higher than that she would have received from the bank, and the interest petitioner paid his wife was less than he would have had to pay the bank in the event he had borrowed the same amount from the bank. The petitioner remained as an auditor of income tax returns with the then Bureau of Internal Revenue until 1937, when he was transferred to the social security division where he remained until he retired in 1952. Prior to 1937 he had personally examined thousands of income tax returns, but thereafter he worked on social security returns exclusively. He was familiar with the procedures for reporting of income. During all the years involved herein petitioner worked a regular 40-hour week as an employee of the Bureau of Internal Revenue. Sometime prior to October 19, 1951, a congressional committee and the Treasury Department agreed that it would be in the best interest of the Bureau of Internal Revenue to have the personnel employed in the Bureau file periodic financial statements. Pursuant to instructions received from the *241 Treasury Department on that date, petitioner filed a "Financial Statement of Employee," on a form provided for that purpose, as of October 31, 1951. The statement was filed by petitioner on November 30, 1951, and was received by the Treasury Department on December 3, 1951. The petitioner reported that he possessed assets worth $279,284.13, with liabilities consisting of mortgages payable in the amount of $28,000. His net worth as of that date was $251,284.13. He listed the following assets: Cash in banks
$ 1,015.38
Cash anywhere else
40,000.00
Due from others-Loans, etc.
155,000.00 [1]
Automobiles
None
Securities
1,368.75
Real Estate
77,000.00
Cash surrender value of
life insurance
3,900.00
Personal effects and household
furnishings
1,000.00
Petitioner further reported in this statement that the salary from his Government job accounted for approximately one-half of his annual income, the remainder consisting of rents and interest. His total income for the years covered by the report, as indicated on the report, was $8,765.89 in 1949 and $8,555.22 in 1950. Expenditures *242 made during the same years exceeded his receipts totaling $8,954.66 in 1949 and $8,947.34 in 1950. He also disclosed in this report that he had $40,000 in cash in a safe-deposit box in The Washington Loan and Trust Co., and he further stated that he had received an amount in excess of $5,000 as the result of a marriage settlement in 1909. [2]
The repercussions to this statement were not long in coming. On March 13, 1952, at 3:45 in the afternoon petitioner was summoned to the office of the intelligence division, Bureau of Internal Revenue, where he was confronted by special agents assigned to investigate the "Financial Statement of Employee" filed by petitioner, who affirmed the truth and correctness of the statement in the course of the interrogation and elaborated on the "marriage settlement." He told the special agents that Lucinda had given him $200,000 in cash the month following their marriage, that prior to her death she had given him an additional $100,000, that this money was given to him in currency, *243 that he buried it, and that some of it still remained buried in Hartford. The petitioner also told the agents that he could not recall having purchased any property during his residence in Washington other than the three houses he owned on Belmont Street, and another located at 1418 S Street. On May 8, 1952, the safe-deposit box which petitioner had maintained in The Washington Loan and Trust Co. since November 16, 1921, was inventoried in the presence of the special agents investigating the petitioner's "Financial Statement of Employee." The contents of the box consisted, among other things, of some old United States coins, an old dollar bill, a ring, a ring setting, a life insurance policy, and five $1,000 bills. The petitioner was married for a third time on May 19, 1952, to Clara Shaw, a widow he had known for many years. On the day following the wedding, she left Washington for Rocky Hill, Connecticut - which was her home and place of employment - in the company of petitioner's son who carried two suitcases containing records petitioner had selected from files which he maintained in the cellar of his house. Petitioner joined her in Connecticut and went over the records contained *244 in the suitcases. These records, which were returned to Washington within the next 2 to 6 weeks, consisted of deeds of trust, mortgages, some checkbook stubs, and some letters. Petitioner obtained a divorce from Clara on June 19, 1956. On his income tax returns for the years involved petitioner reported his salary, his rental income, and his miscellaneous or interest income, as follows: 1948
1949
1950
Gross Rental Income
$6,827.54
$7,864.23
$7,898.60
Less: Depreciation
880.00
880.00
880.00
Other Expenses
5,638.02
5,032.06
5,371.46
Net Rental Income
$ 309.52
$1,952.17
$1,647.14
Salary
3,912.97
4,114.48
4,200.04
Less: Union dues
6.00
Interest or Miscellaneous Income
1,437.18
2,613.72
2,583.08
Gross Income
$5,653.67
$8,680.37
$8,430.26
Less: Standard Deduction
565.37
868.04
843.03
Net Income
$5,088.30
$7,812.33
$7,587.23
In each of the 3 years involved petitioner scheduled as the property giving rise to his rental income three houses on Belmont Street, a house on S Street, and his Otis Street lots in Hartford. [3] He used all of the lines provided for this purpose on the forms, as well as extending his figure into *245 the writing beneath the section provided for reporting income from rental property. It was not necessary to indicate the sources of interest income on the returns for the years 1948 and 1949 as only total figures were requested on the forms. Beginning with the forms provided for reporting income for the taxable year 1950, it was requested that the name and address of the payor of the interest be furnished. Accordingly, petitioner indicated, in the space provided on the form for the taxable year 1950, that he received $2.38 interest from the Westfield Savings Bank in Westfield, Massachusetts, $1.18 from the Dime Savings Bank, and $1.20 from the Society for Savings, both in Hartford. He also reported $2,578.32 as "Misc." in the section labeled "Income from Interest." The property listed on petitioner's returns for the years *246 1948 through 1950 was acquired between June 1, 1923, and December 31, 1939. As already indicated, petitioner purchased 1462 Belmont Street on June 1, 1923, and this house has served as his residence to this day. On January 14, 1926, he acquired 1460 Belmont Street. On July 1, 1927, he purchased 1618 S Street for $30,000, and on December 31, 1939, he acquired 1458 Belmont Street. The petitioner either obtained purchase money mortgages on all of this property or assumed the mortgages of the previous owners. On September 22, 1947, petitioner acquired two houses located at 525 and 527 2nd Street, N.E., in Washington, D.C., from which he derived rent. He did not include this property in the schedules of rental properties in his tax returns for the years 1948, 1949, and 1950. His reason for not listing this property was that there was no more room in the schedules of rental properties appearing on the printed tax forms, so he calculated all of his other income, including the rental income from this property for all of the years involved, and listed the net figures, after taking allowable deductions, as interest or miscellaneous income on his returns for the years involved. The petitioner *247 was of the opinion that precise information as to the source of income was of no real importance as long as the returns accurately reflected the taxes due on the income received. Additional property was acquired by petitioner in the years 1949 and 1950, and in the course of the investigation of the case the agents discovered that petitioner owned or had owned other property not previously specifically acknowledge. The following is a summary of petitioner's real estate purchases: Date Acquired
Property
Cost
6/ 1/23
1462 Belmont St., N.W., Washington, D.C.
$11,500 plus $3,000 improvements
$14,500.00
1/14/26
1460 Belmont St., N.W., Washington, D.C.
$10,000 plus $2,000 improvements
12,000.00
7/ 1/27
1618 S St., N.W., Washington, D.C.
30,000.00
12/31/39
1458 Belmont St., N.W., Washington, D.C.
$8,000 plus $6,000 improvements
14,000.00
11/ /41
1424 K St., N.W., Washington, D.C.
9/22/47
525 2nd St., N.E., Washington, D.C.
12,000.00
9/22/47
527 2nd St., N.E., Washington, D.C.
12,000.00
2/24/49
6320 Brookville Rd., Chevy Chase, Md.
18,000.00
3/18/49
437 H St., N.W., Washington, D.C.
Land $3,861.26 plus bldg. $3,700
7,561.26
5/25/49
1820 Kalorama Road, N.W., Washington, D.C.
18,412.73
10/ /49
105 41st St., N.E., Washington, D.C.
11/19/49
1254 4th St., S.W., Washington, D.C.
Land $4,022.13 plus bldg. $1,063.94
5,086.07
11/19/49
1256 4th St., S.W., Washington, D.C.
$5,086.07 plus improvements $2,670.20
7,756.27
7/ 2/50
1005 Mass. Ave., N.E., Washington, D.C.
$11,000 plus improvements $350
11,350.00
7/31/50
1432 K St., S.E., Washington, D.C.
7,619.00
8/ 3/50
9515 Colesville Rd., Silver Spring, Md.
31,779.41
8/31/50
1510 E. Capitol St., Washington, D.C.
4,595.93
12/ 6/50
600 Keefer Place, N.W., Washington, D.C.
8,718.81
*248 On October 17, 1949, petitioner sold the property owned by him and located at 1820 Kalorama Road, N.W., Washington, D.C., which he had acquired on May 25, 1949. The gain on the sale was $504.40. On October 10, 1950, petitioner's property, located at 1256 4th Street, S.W., Washington, D.C. (which was acquired by petitioner on November 19, 1949), was sold. The gain on this sale was $357.62. The property located at 437 H Street, N.W., Washington, D.C., which had been acquired by petitioner on March 18, 1949, was sold on April 26, 1950, and the gain resulting from the sale was $1,184.80. These gains were not reported separately on petitioner's returns for the years in which they occurred, but petitioner stated that these amounts were included in the miscellaneous or interest income figures reported on his returns. Prior to his acquisition of the property located at 9515 Colesville Road in Silver Spring, Maryland, petitioner had a third trust note on this property. On August 3, 1950, the payments due under the terms of his note were in arrears, so he foreclosed the mortgage and acquired the property. He paid real estate taxes on this property in the amount of $272.57 on October 4, 1950, to *249 Montgomery County, Maryland. At the time he foreclosed, first and second trust notes were still outstanding on the property. The first trust note was owned by the Equitable Co-operative Building Association, to which petitioner paid $491.26 interest in November 1950. The second trust note was held by a husband and wife referred to as the Olsons. The principal amount of this note was $9,636.45. The petitioner paid the Olsons $1,000 in 1950, giving them personal checks in the amounts of $200, $300, and $500. These checks included both principal and interest payments, and the interest for the 5 months petitioner owned the property in 1950 amounted to $240.19. The respondent did not allow petitioner to deduct either the amount paid as interest or the taxes on this property in 1950. Concurrently with his acquisition of rental properties, petitioner was dealing in second trust notes. In 1947 he purchased $7,000 worth of such notes, and in 1949 he invested another $11,000 in second trust notes. It was his practice to purchase these notes at a discount. The parties stipulated that petitioner received interest and discount income in the following amounts: 1948
1949
1950
Interest Income
$474.83
$490.40
$1,272.98
Discount Income
102.14
153.73
305.95
*250 Respondent determined - and the parties subsequently stipulated that the determinations were correct, subject only to the petitioner's right to show additional expenditures - that petitioner had the following income and expenses in connection with his rental properties in the years specified: 1948
1949
1950
Rental Income
$9,995.08
$11,863.83
$12,213.96
Depreciation Expense
1,200.00
1,612.35
2,116.38
Other Expenses
5,487.14
7,443.27
9,185.23
In the taxable years 1948, 1949, and 1950 petitioner spent $83.79, $107.52, and $112.04, respectively, for real estate taxes and $34.58, $31.50, and $5.50, respectively, for removal of snow from the sidewalks in front of the lots owned by him and located on Otis Street in Hartford, Connecticut, to which we have already referred. In 1949 he spent $24 for repairing the sidewalk in front of these lots. These lots were acquired for rental purposes and had been held by him for that purpose until they were sold in 1950. The respondent did not allow petitioner any deductions for any of these expenditures. Throughout all of the taxable years involved herein petitioner maintained his residence at 1462 Belmont Street, *251 N.W., Washington, D.C. The expenses incurred by petitioner in connection with this entire property in the years involved were $925.02 in 1948, $915.42 in 1949, and $1,382.70 in 1950. Petitioner and his family occupied only a part of this property, the remainder being rented by him. The parties are in agreement that two-thirds of the expenses relating to this property may be deducted by petitioner as having been paid in connection with the operation of rental property. In addition, petitioner claims that since he used a part of the premises occupied by him as an office in connection with his income-producing activities he is entitled to additional deductions. Petitioner used one-fourth of the premises occupied by him as an office for one-half the time. Petitioner borrowed money from various lending institutions during each of the taxable years involved herein. These borrowed funds were used for repairing petitioner's rental property, for paying the real estate taxes on this property, and to enable petitioner to make monthly payments on the principal amounts of loans incurred to finance the purchase prices of various rental properties. The amounts of interest paid were as follows: *252 Lending Institution
1948
1949
1950
National Metropolitan Bank
$152.17
$256.42
$ 40.01
American Security and Trust Company
44.11
257.67
67.56
United States Veterans Administration
154.96
154.96 The respondent did not allow petitioner to deduct any part of these interest payments. In connection with making a loan petitioner filed a financial statement with the American Security and Trust Company on March 7, 1950. The statement indicated the following: Assets
Cash on hand
$ 4,000.00
Cash in Bank
4,000.00
Real Estate
109,000.00
Furniture and fixtures
1,000.00
TOTAL
$118,000.00
Liabilities
Notes payable to banks
$ 3,500.00
Mortgages or liens on real estate
46,707.83
Total liabilities
$ 50,207.83
Net worth
67,792.17
TOTAL
$118,000.00 The real estate listed on this statement included the three houses on Belmont Street, 1618 S Street, 525-527 2nd Street, N.E., and the Otis Street lots in Hartford, Connecticut. Beside an item labeled "State annual net income from real estate and securities" petitioner wrote the figure $8,250, but the word "net" has been crossed out with a pen. As already indicated herein, petitioner *253 borrowed money from his wife, and later his children, in order to obtain funds to further carry out his rental activities. In 1948 petitioner deposited $442.91 to his children's accounts, of which he was trustee, in the Perpetual Building Association, Washington, D.C. These deposits included the sum of $356.87, which petitioner paid as interest to his son and daughter on money taken from their accounts as loans. In 1949 petitioner deposited $2,972.66 in the same accounts, of which $411.25 was interest, and in 1950 he deposited $399.50 to his children's accounts, all of which represented payments of interest. The funds withdrawn as loans from these accounts were used by petitioner for repairs, taxes, and monthly payments due on his rental properties. Petitioner was not allowed to deduct any of these payments as interest expense during the years involved. Petitioner was not the real owner of the funds deposited to the trust accounts belonging to his children at Perpetual, but he was the trustee of these funds and held them for the benefit of his son and daughter. He did not realize any interest or other income from the funds deposited in these accounts during the years 1948, 1949, *254 and 1950. The parties have stipulated that petitioner did not receive a bonus of $45 during the taxable year 1949, as originally determined by respondent. In the notice of deficiency respondent determined that petitioner's net income for the taxable year 1948, as shown on his return, should be increased by the amount of certain deposits made to various bank accounts in petitioner's name during that year which cannot be specifically identified as to their source. His deposits during the year 1948 totaled $86,481.60, [4] of which $16,125.98 was deposited in the American Security and Trust Company, sometimes hereinafter referred to as American, and $70,355.62 in the National Metropolitan Bank, sometimes hereinafter referred to as National. The respondent subtracted from the total deposits certain specifically identified deposits amounting to $24,515.94 and income items that could have been deposited in the amount of $10,236.59. The parties subsequently stipulated that the unidentified deposits in the amount of $52,171.98 should be reduced in the amount of $3,356.87, as a result of deposits totaling $356.87 to the children's accounts at Perpetual by checks drawn on the petitioner's *255 account at National, and a decrease in the estimated cash personal expenditures previously determined by the respondent from $6,000 to $3,000. On March 5, 1948, petitioner borrowed $3,500 from American, and there was an increase in his bank account at National on March 10, 1948, from $755.79 to an amount in excess of $5,000. The bank statement introduced into evidence is not completely legible, but it is apparent that a substantial deposit was made by petitioner shortly after the loan of $3,500 was granted by the bank. On November 30, 1948, the Veterans Administration loaned petitioner $3,874. The statement of petitioner's account at American indicates a balance of $249.36 on November 26, 1948. The next entry is blurred, but the next legible balance, after an unidentified deposit of $1,670.26, made on December 15, 1948, is $7,116.62. Sometime between November 30 and December 15, 1948, petitioner made deposits in excess of $5,000 *256 to his account at American, which included the $3,874 borrowed from the Veterans Administration. Therefore, the amounts of $3,500 and $3,874 constitute identified deposits. The parties stipulated during the course of the trial that gross rentals received by petitioner in 1948 exceeded the net rentals received by him in that year by $767.19. This amount represents expenses incurred for petitioner's rental property, located at 525-527 2nd Street, N.E., and 1618 S Street, N.W., which was handled for him by a rental agent who made a practice of remitting only net amounts to the property owners. In respondent's original determination the gross rental figures were included in the income items which could have been deposited. After making the above adjustments, the unidentified deposits for the taxable year 1948 totaled $41,765.39. Gross deposits made by petitioner in the taxable year 1949 totaled $72,449.54, of which $15,033.94 represented income items that could have been deposited, and deposits totaling $37,248.29 which have been specifically identified. The respondent determined that the difference - $20,167.31 - represents additional income to petitioner during the year 1949. The *257 parties have subsequently stipulated that the unidentified deposits for the year 1949 should be reduced in the amount of $6,411.25, consisting of $411.25 deposited to the children's accounts at Perpetual by check drawn on the National account, a loan of $3,000 to petitioner from National and deposited the same day (June 6, 1949) to his account at National, and a $3,000 decrease in the estimated cash personal expenditures of petitioner from $6,000 to $3,000. In addition, petitioner discounted a note in October 1949 in the amount of $1,500, cashed a check drawn on American and payable to Perpetual in the amount of $660 on January 26, 1949, and withdrew another $1,900 from Perpetual on July 5, 1949, thus resulting in additional identified sources of cash available for deposit and which was deposited or available for deposit by petitioner in his checking accounts in 1949. This results in a further reduction of the unidentified deposits in the amount of $4,060. According to the stipulation made at the trial, the unidentified deposits should be increased by the amount of $841.59, which amount represents the expenses in connection with the rental property managed by an agent, who remitted *258 only net amounts to petitioner. This addition serves to correct the "[income] items that could have been deposited" figure as determined by respondent in the notice of deficiency. After making the above adjustments, the unidentified deposits for the taxable year 1949 amount to $10,537.65. The bank deposits made by petitioner during the taxable years 1948 and 1949, other than those which have been specifically identified, were made from a sum of money owned by him prior to the taxable years involved, and none of it consisted of income realized during the taxable years. The deposits were made from the residue of a large sum of cash paid to him in 1909 incident to the premarital agreement between himself and his first wife, Lucinda. He brought a large part of this money to Washington in November 1921 and placed it in the safe-deposit box that he rented that year at The Washington Loan and Trust Co. Sometime during or after 1936 he brought an additional part of the remaining cash to Washington. In 1948 and 1949 he still had over $50,000 in cash of the original larger cash sum received from his first wife, part of which was hidden in his home and the remainder was in his safe-deposit *259 box. The deposits made to the bank accounts during 1948 and 1949 were made in order to keep the bills in petitioner's cash hoard in good condition and of current circulation. He also deposited funds from time to time in anticipation of a deal that failed to materialize, whereupon he withdrew the funds and returned them to his cash hoard. Whenever he deposited old currency it was petitioner's practice to withdraw the currency by writing a check payable to cash. As he saved his canceled checks only for purposes of receipts for payments made, checks which were drawn payable to cash were always destroyed by petitioner each month as they were received from the bank. During the year 1948 petitioner wrote checks payable to "cash" totaling $50,592.44 on his account at National and totaling $14,500 on his account at American. During the year 1949 petitioner wrote checks payable to "cash" totaling $11,030.67 on his account at National, and totaling $34,424.55 on his account at American. At the end of the year 1947 petitioner's account at National had a balance of $858.41, and the balance at the close of the years 1948 and 1949 were $1,186.35 and $1,160, respectively. His account at American *260 was opened in November 1948 with a deposit of $128.31, and the balances at the end of the years 1948 and 1949 were $254.29 and $145.56, respectively. The revenue agents investigating petitioner's case made a thorough examination of petitioner's business affairs, including his possible sources of income. There is no evidence in the record as to any source from which petitioner could have derived the income which the respondent has determined was represented by the unidentified deposits. The standard of living of petitioner and his family during all the years involved herein was modest. He owned no car and employed no servants. He did not go to the theatre often and did very little entertaining at home. He did not purchase many furnishings for his home. Petitioner's living expenses paid by check totaled $2,489.53 in 1948 and $1,738.24 in 1949. Petitioner did not engage in any lending activity other than his second trust notes, he has never won any contest or lottery, and he did not engage in gambling, illegal, or illicit activities. His sole sources of income during the taxable years were his Government employment, his rentals of real estate, his dealings in real estate, and his *261 discount of real estate trust notes. Petitioner furnished the full support for his two children and his mother during the taxable years 1948, 1949, and 1950, and he claimed all three of them as dependents on his tax returns. This claim has not been questioned by respondent. The two children lived at petitioner's Belmont Street home and both were full-time students wholly dependent upon petitioner for their support. His mother was hospitalized for the entire year of 1950. Medical expenses incurred by petitioner on his own behalf and on behalf of his dependents totaled $2,309 in 1950. Petitioner also contributed $5 to the Community Chest in 1950. Petitioner took standard deductions on his original returns for the taxable years. Petitioner in his business relations is insistent on details to the extent of being a disagreeable person to deal with. He is abnormally suspicious and fearful of being overreached or interfered with. He is an eccentric miser. The revenue agents working on this case determined the petitioner's rental income, interest income, capital gains, and discount income by referring to petitioner's records and by questioning petitioner, who refused to volunteer any *262 information relative to his business transactions until he was confronted with outside evidence of his additional sources of income uncovered by the agents assigned to the case. Petitioner would then bring forth his penciled notes and receipts relating to the property. This was also true of his transactions in second trust notes, and he did not indicate how many such notes he owned until the agents confronted him with the results of their investigation, which indicated he did own such notes. Although petitioner would furnish the investigators any information they requested, he did not open all of his records to them at one time. He said that it was "more than the ordinary stranger would really grasp in a couple of hours." He was most unwilling to tell either the agents or the Court exactly where and how the currency was hidden, which represented the unspent and uninvested proceeds of his "marriage settlement," other than it was in his safe-deposit box, his basement at home, and secreted in a safe place in Hartford. However, on one occasion during the investigation, he exhibited to the agents over $17,000 in currency, including $17,000 in $1,000 bills, one of which was issued in 1936, *263 two in 1940, one in 1943, one in 1947, and the rest in the early 1950's. The unidentified deposits made to petitioner's bank accounts during the years 1948 and 1949 do not consist of income taxable to petitioner. To the extent that the interest or miscellaneous income figures appearing on petitioner's returns for the taxable years exceeded the amounts of interest stipulated as having been received by him, such excesses represent items of rental income, discount income, and capital gains received by him during such years. No part of the deficiency for any of the years involved was due to fraud with intent to evade the payment of taxes. Opinion KERN, Judge: The most important issue, dollarwise, in this proceeding, and one of the most troublesome for our solution, has to do with the alleged unexplained bank deposits made during 2 of the taxable years which respondent has determined constitute taxable income. The trouble arises largely out of the extraordinary explanation given by petitioner with regard to the source of the money so deposited. That explanation is the story set out more fully in our findings which may be summarized as follows: That when petitioner was a young *264 man barely of age he was selling ladies' stockings one summer in Hartford, Connecticut, in an attempt to earn his way through the Yale University Law School, that while in pursuit of that worthy occupation he met a widow of some means who became enamored of him and offered him a considerable cash sum (according to petitioner's testimony, over $200,000) if he would marry her, that he married her in 1909 and she gave him not only the sum agreed upon at the time of or before the marriage but also a large bonus after the marriage, that a condition of this gift or "settlement" was that it should be a secret between them, that since the episode petitioner had been ashamed of it, that he kept the cash in a cash hoard, part in a safe-deposit box, and part secreted in his home and elsewhere, that to keep the currency in usable condition and current issues he would make periodic deposits of it in his banks and would withdraw it by checks written to "cash" which he restored to his hoard, that he would make only occasional use of it for the purpose of making new investments, and that those deposits constituted the deposits alleged by respondent to be unexplained and determined by him to be income. *265 This extraordinary story is to some extent substantiated by court records which show beyond doubt that petitioner did marry his first wife in 1909 when he was 21 years old and she was 70, and that she was a frugal woman of some means, and by the undisputed facts in the record which are: That petitioner invested a considerable sum of money in Hartford real estate a few years after his marriage and before the settlement of his then deceased wife's estate and only 2 years after he began the practice of law; [5] that almost immediately after he came to Washington and became employed by the Bureau of Internal Revenue at a salary of $1,240 a year he rented a safe-deposit box; that large sums of money were withdrawn by petitioner from his bank accounts during the first 2 taxable years by checks payable to "cash" which have not been traced into either investments or living expenses, substantiating petitioner's testimony that he kept large amounts of cash in his possession., that immediately after the investigation of this case commenced respondent's agents found 5 $1,000 bills in petitioner's safe-deposit box, and later during the investigation were shown seventeen $1,000 bills by petitioner; *266 that before the tax liability of petitioner ever was in question he stated to respondent that he had received in excess of $5,000 as a "marriage settlement" in 1909, that he had large sums of cash located in places other than banks, and that he had one item of assets in the amount of $155,000 acquired in 1909; and that there is no evidence herein as to any other potential source of income to petitioner during the taxable years from which he could make the deposits here in question, despite the vigorous investigations of respondent's agents. Our reluctance to accept this story is on account of the following considerations: The extraordinary circumstances of the story itself, the discrepancy between the huge [6] amounts of money which petitioner testified were given him by Lucinda and the amounts which are within the range of our credulity; the reluctance of the petitioner to cooperate with respondent's agents during the course of the investigation with regard to disclosures as to his assets and the manner in which he secreted *267 his cash, and his equivocal testimony with regard to the latter matter; the discrepancy between the financial statement filed by him with a bank and his later statements; and the strange circumstance that petitioner with his "cash hoard" would incur indebtednesses not only to persons from whom he purchased properties and to banks (and to the Veterans Administration) but also to his children for whom he was acting as trustee, a course of conduct which can only be characterized as eccentric. As indicated in our findings of fact, it is our conclusion from petitioner's testimony, his demeanor on the witness stand, and the record as a whole that petitioner was and is eccentric. The fact that a graduate of the Yale University Law School would be working for the Government in a minor clerical office at a little over $4,000 a year after 39 years of employment would of itself indicate that petitioner had serious personality deficiencies. In our opinion he was a thoroughly disagreeable man to deal with, was overly suspicious and secretive, and was impatient of all authority. He appeared to be still affected by shame over entering into the *268 mercenary transaction connected with his first marriage. In our opinion he sought and found solace for this shame in the secret possession of large amounts of cash. We have concluded that he was an eccentric miser, whose course of conduct would not be that of normal men. Our conclusions with regard to petitioner's personality considerably weaken a number of respondent's arguments. To stress again one fact which we have already mentioned, we point out that nothing in the record indicates the possibility that petitioner could have or did realize income during the taxable years 1948 and 1949, either from sources other than disclosed in petitioner's returns and several statements, or from those sources in amounts remotely equivalent to the amounts of the so-called "unexplained deposits." In fact, the evidence indicates the contrary. And we have no doubt that the respondent's agents, piqued, as they naturally would be, by petitioner's startling financial statement filed on November 30, 1951, and by his extraordinary explanations, and irritated by his lack of cooperation, made as thorough an examination into petitioner's affairs as could possibly be made. We have concluded that the *269 alleged "unexplained deposits" made by petitioner in 1948 and 1949 were made from cash capital acquired by him in prior years, and did not constitute gross income received by him during those years. We have also concluded that the ultimate source of that cash was from Lucinda's "marriage settlement" supplemented by his inheritance from her estate. In the main, but not without some doubt, we have accepted his story of the "marriage settlement." However, with regard to the amount thereof, petitioner's testimony exceeds the limits of our credulity. It will be noted that we have not found that petitioner received $300,000 or even $200,000 in cash from Lucinda at the time of their marriage. We have found that he received "a large part of her [Lucinda's] cash savings" which savings amounted to "a considerable sum (over $100,000)" which in our opinion was sufficient in amount to furnish a source, even after prior withdrawals, if any, for the so-called "unexplained deposits" made by petitioner in 1948 and 1949. Accordingly, we decide the issue having to do with "unexplained deposits" in favor of petitioner. Turning to the subsidiary issues, we have found that petitioner acquired the *270 lots located on Otis Street in 1913 and that he paid $1,000 apiece for them. The only evidence as to the price paid is petitioner's own testimony at the trial. However, this testimony was uncontradicted and unshaken on cross-examination. Since the transaction involved occurred some 47 years before the trial of this case, it is not surprising that substantiating documentary proof was unavailable. Respondent argues that it is incredible that any property near any city purchased in 1913 at $1,000 a lot would sell in 1950 at less than $500 a lot. [7] However, it is our opinion it is not improbable that petitioner, then a young man embarking on his first real estate venture, might have bought at the wrong time property located in the wrong locality for an unwise price. Petitioner's testimony concerning the purchase price paid by him for these lots indicates that he was still somewhat bitter over the bad bargain which he had made, despite the fact that in 1955 he sold two adjacent lots for over $6,000 apiece. Although these lots have not produced a steady income, petitioner for a number of years was able to rent them for greenhouse and garden purposes. The fact that no rent was derived from *271 them during the years in issue does not destroy their character as property acquired for the production of income. Solomon Wright, Jr., 9 T.C. 173; Carter-Colton Cigar Co., 9 T.C. 219; Mary E. Crawford, 16 T.C. 678. It is clear that they would have produced further income had the petitioner been successful in finding tenants during the years involved. The expenses incurred by petitioner in connection with these lots are deductible as ordinary and necessary business expenses under section 23(a)(2), and the loss incurred upon their sale is a loss within the meaning of section 117(j)(1). [8]Graves Brothers Co., 17 T.C. 1499. *272 We are satisfied from the evidence that petitioner did make a part-time use of a portion of his dwelling as an office, in connection with his income-producing activities, but this use was not as extensive as petitioner contends. We have found that he used as an office during one-half the time one-fourth of the premises occupied by him. Accordingly, we conclude that petitioner is entitled to deduct one-eighth of the one-third of the expenses allocable to 1462 Belmont Street, N.W., Washington, D.C., which have not already been allowed as a deduction. Another issue concerns the deductibility from petitioner's gross income of certain interest payments on loans obtained by him from the Veterans Administration and from certain financial institutions. Petitioner testified that he made these loans for the purpose of making repairs on rental properties and paying taxes and monthly payments thereon. There is nothing in the record to contradict this testimony and, accordingly, we have so found. Therefore, we conclude that such payments of interest are deductible from gross income pursuant to the provisions of sections 22(n)(4) and 23(b) of the Internal Revenue Code of 1939. See Corrinne S. Koshland, 19 T.C. 860, *273 affd. 216 F. 2d 751; James J. Standing, 28 T.C. 789, affd. 259 F. 2d 450. Petitioner was trustee of two bank accounts in the names of his children at the Perpetual Building Association in Washington, D.C. The funds in these accounts were derived primarily from the proceeds of the sale of a farm belonging to petitioner's second wife and an endowment insurance policy on her life which matured in 1941. The petitioner borrowed this money from his wife, giving her two demand notes as evidence of the indebtedness, both of which bore interest. He used the money to pay for repairs and taxes on his rental properties and to make monthly payments on the loans secured by mortgages thereon. As his wife desired that her children eventually have these funds, she endorsed these notes to them. Petitioner paid the interest to his wife until her death and thereafter he deposited amounts equivalent to the interest due to his children's accounts at Perpetual. From time to time petitioner also deposited parts of the principal amount to his children's accounts, such deposits constituting repayment of the principal. The children had access to the bank books at will, *274 and they were aware that their father withdrew funds from their accounts which they regarded as bona fide loans. We are satisfied that the trust accounts were genuine and that the withdrawals from these accounts were loans made by the children to their father to enable him to further his income-producing activities, that the interest paid by Perpetual on the amounts remaining on deposit was not income to petitioner, and that the interest payments petitioner deposited to the accounts were deductible. See Corrinne S. Koshland, supra, and James J. Standing, supra. For the taxable year 1950 respondent disallowed certain deductions for taxes and interest paid by petitioner in connection with the property located at 9515 Colesville Road, Silver Spring, Maryland. Respondent contends that the payments were made in connection with the acquisition of the property, and therefore were includible in petitioner's cost or basis, while petitioner contends that these payments were made after the date of foreclosure, and are therefore expenses deductible under sections 22(n)(4), 23(b), and 23(c). As far as the taxes are concerned, respondent contends that these taxes accrued *275 prior to the date of purchase and were the obligation of the previous owner, and under the decision in Magruder v. Supplee, 316 U.S. 394, they are not deductible by petitioner. Upon the authority of numerous opinions of this Court, the deductibility of real estate taxes depends upon whether or not such taxes are the obligation of the taxpayer claiming the deduction, such obligation depending upon the date the unpaid taxes become a lien on the property. Lifson v. Commissioner, 98 F. 2d 508; Norman Cooledge, 40 B.T.A. 1325; Ernst Kern Co., 1 T.C. 249; Asthmanefrin Co., 25 T.C. 1139. Md. Ann. Code, art. 81, secs. 46 and 69, indicates that unpaid taxes constitute a lien on real property from the date the taxes become payable, and the date such real estate taxes become payable in Maryland varies, depending upon the happening of certain events. Respondent's determination is presumptively correct and the burden is on petitioner to show that it is incorrect. Petitioner may not rely, as he attempts to do here, upon the lack of evidence that the taxes were delinquent at the time of foreclosure, which occurred in August 1950. To *276 be entitled to the deduction petitioner must show that the taxes accrued after he acquired the property. Having failed to do so, we must sustain the respondent's determination that the taxes paid by petitioner on October 4, 1950, are not deductible either as expenses incident to property held for the production of rents under section 22(n)(4) or as an ordinary deduction for taxes paid by an individual under section 23(c). Respecting the payments of interest made on the Colesville Road property, petitioner has only partially met his burden of proof. We are satisfied from the evidence presented that petitioner did pay $240.19 interest on a second trust note on this property, which amount represented the interest due for the last 5 months of the taxable year 1950. The evidence does not show whether the interest paid on the first trust note accrued before or after the acquisition of the property by petitioner. Accordingly, petitioner is entitled to an additional deduction for interest paid in connection with his rental properties in the amount of $240.19 for the year 1950. Petitioner has introduced no evidence indicating when the interest on the first trust note accrued. Therefore, we *277 sustain the respondent's determination that the amount of $491.26 allegedly paid as interest is not deductible as interest expense, but that such payment was properly added to the cost of acquisition of the Colesville Road property. Joell Co., 41 B.T.A. 825, 827. John Hancock Mutual Life Ins. Co., 10 B.T.A. 736, 740. The next issue relates to the respondent's inclusion in petitioner's income for the taxable years involved of certain amounts reported on petitioner's returns as interest or miscellaneous income. The respondent contends that his determination is justified because petitioner has not offered any breakdown or shown in any manner how he arrived at the figures reported on his returns. Petitioner contends that inasmuch as he had used all of the available lines on the returns, he added all of his other income - be it rental, interest, discount, or capital gain - and subtracted from the total of such other income such deductions as he determined were permissible, and reported the difference as interest or miscellaneous income. It should be borne in mind that the returns used in those years were not as refined as the present forms are, and only in 1 *278 year, 1950, was it necessary to specify the source of interest income. It is apparent that the amounts so reported by petitioner would include much of the income specifically identified in our findings, and to uphold respondent's determination would result in taxing that income twice. Under the circumstances, we hold that respondent's determination of this issue was erroneous. There was also some question as to the right of petitioner to itemize his deductions for the taxable year 1950, inasmuch as he elected to take the standard deduction at the time he filed his return for that year. We think it is plain that such option was available to petitioner as a result of the enactment of section 23(aa)(7), [9] which section was effective for taxable years beginning after December 31, 1949. The *279 parties have stipulated the amount of medical expenses paid by petitioner in 1950 on behalf of three persons who are shown by the record to have been dependents of petitioner during that year. Respondent on brief makes no argument that petitioner is not entitled to a deduction on account of such payments nor does he make any argument that section 23(aa)(7) is not applicable. A proper adjustment on account of this item shall be made under Rule 50. A similar situation exists with regard to the charitable contribution made in 1950 in the amount of $5 and a similar disposition will be made thereof. Our decisions on all the issues here involved (and particularly the issue having to do with the so-called "unexplained bank deposits") make it apparent that we must decide the issue having to do with the fraud penalties against respondent. Decision will be entered under Rule 50. Footnotes
1. All references are to sections of the Internal Revenue Code of 1939 unless otherwise indicated.↩
1. His financial statement shows the "Date Acquired" of this item to be "1909."↩
2. In answer to a question whether he had ever "received an amount in excess of $5,000.00 by way of a gift, bequest or legacy," he answered "Yes. * * * Marriage settlement."↩
3. These lots were included in the schedules not for the purpose of showing the receipt of rental income therefrom, since they were not rented during these years, but to show that taxpayer incurred expenses in connection with them ranging from $120 a year to $161, which were included in the expenses deducted from the gross rentals reported in these schedules.↩
4. On the statement attached to the deficiency notice petitioner's 1948 gross deposits are listed at $86,924.51 and the unidentified deposits at $52,171.98. The discrepancy between the stipulation and statutory notice is not explained in the record.↩
5. It should be noted that he left this practice some years later to accept a position with the United States Government at a salary of about $1,200 a year.↩
6. "Huge," that is, in terms of 1909 dollars.↩
7. The sales price is stipulated. ↩
8. SEC. 117. CAPITAL GAINS AND LOSSES. (j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1)↩, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1)(C). * * *
9. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (aa) Optional Standard Deductions for Individuals. - (7) Change of election. - Under regulations prescribed by the Secretary, a change of an election to take, or not to take, the standard deduction for any taxable year may be made after the filing of the return for such year. * * *↩